UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

TINA M. BOYER              )
                           )
        Plaintiff,         )
                           )        No. 6:18-CV-90-REW
v.                         )
                           )        OPINION AND ORDER
ALLEN SHIRLEY, et al.,     )
                           )
        Defendants.        )

\*\*\*  \*\*\*  \*\*\*  \*\*\*

The Court confronts several (eight, in total) weighty motions in this civil rights action arising out of alleged police and jail staff misconduct. Plaintiff Tina Boyer alleges that three general groups of Pulaski County, Kentucky officials violated her constitutional rights in March 2017: (1) the Pulaski County Sheriff's Department (PCSD) Defendants – Sheriff Greg Speck and Deputies Allen Shirley and Bryan Shepherd; (2) the Corhealth Defendants – Nurse Amy Parsons and Corhealth Solutions, LLC; and (3) the Pulaski County Detention Center (PCDC) Defendants – Jailer David Moss and Deputies Lila Coffman, Sharita Liner, and Niki West.

Some pending motions seek to limit the proof scope (both at this stage, and potentially at trial), and others argue for merits-based dismissal of various claims. The Court addresses each in turn, beginning with the evidentiary considerations. After refining the proof landscape, some claims fail as a legal matter or based on the undisputed evidence of record. Others, though, as to only part of the defendants, present triable fact issues and must proceed to a jury.

## A.  FACTUAL BACKGROUND

A considerable chunk of the at-issue events in this case was captured on video. The Court has watched them all. The Court summarizes the relevant facts (taken in the light most favorable

1

to Plaintiff, with reasonable inferences drawn in her favor) against the backdrop of the video recordings.[1]

During the daytime hours of March 24, 2017, Plaintiff Tina Boyer spent some time socializing and drinking beer (and perhaps other alcohol—the precise amount is indeterminant) with her friend, James Brumley. DE #84-2 (Boyer Dep.) at 7–8.[2] The pair spent the day at Brumley's apartment. *Id.* at 10. Later in the evening, they left Brumley's residence and approached a neighboring apartment, intending to seek a ride to the store to buy cigarettes. *Id.* at 59–60. Boyer had with her a small dachshund, her pet. *Id.*

Then, the video picks up the situation as Pulaski County Sheriff's Department (PCSD) Deputy Allen Shirley approaches the scene, together with fellow deputy Bryan Shepherd (in a separate vehicle).[3] Shirley Body-Worn Camera ("BWC") (Arrest Video), at 00:00–00:28. The dachshund is visible passing through the frame. *Id.* Boyer stands near the apartment with Brumley, and Brumley explains that the pair is trying to get a ride to the store. *Id.*, at 00:30–00:40. Shirley responds that the officers are too busy to offer anyone a ride, and Brumley (largely incoherently) asked if Shirley needed his ID. *Id.*, at 00:40–00:48. Shirley replied that he did not. *Id.* The group then engaged in conversation. *Id.*, at 00:50–01:11 (discussing how Shirley might have known Boyer, and where Boyer worked locally). Boyer, responsive and attentive, is not visibly impaired (at least, her status is debatable) or at all disorderly during this period. Brumley plainly is significantly impaired.

---

[1] The various clips appear at multiple places in the docket. Each relevant (unsealed) clip is included, for example, on the conventionally filed DE #96 flash drive. The Court refers to the clips per that filing, generally, but specifically identifies the clip and timestamps throughout.
[2] For precision, the Court uses the original deposition transcript pagination.
[3] Together with Pulaski County Sherriff Greg Speck, the Court refers to the three officer Defendants collectively as the "PCSD Defendants."

2

At one point, Shirley asked Boyer how much she had to drink. *Id.*, at 01:11–01:20. She said "none," then quickly "a couple." *Id.* After some initial tension on the subject, Shirley asked to see Boyer's ID. *Id.*, at 01:25–01:33. Boyer asked to get her loose dog first, but Shirley told her no and stopped her. *Id.* The two then went back and forth for a bit, with Boyer again asking to get her dog, and Shirley asking her to remain where she was and produce her ID. *Id.* Boyer requested to go inside to get her ID; Shirley refused. *Id.*, at 01:33–02:03. Brumley's audible mumbling in the background adds to the overlapping conversations. Shirley then changed the subject, asking Boyer where her dog had gone. *Id.*, at 02:03–02:15. Boyer subsequently continued to voice that she did not want the dog to run into the road and get hurt, and Shirley asked Shepherd (who had been nearby during the preceding events) to walk around and look for the dog. *Id.* The dog was a source of worry to Boyer.

The tension between Shirley and Boyer then grew, as she audibly fretted about the dog's safety and turned away, and he told her to turn around and "look at [him]." *Id.*, at 02:15–02:18. Shirley then said: "If you don't lose your frickin' [sic] attitude, I'm going to take you to jail, do you understand" *Id.*, at 02:19–02:30. Boyer told him to "go ahead," and turned around and placed her hands behind her back. *Id.* Shirley then proceeded to handcuff Boyer. *Id.* As Boyer was being handcuffed, she (talking to Brumley, who remained nearby) called Shirley a "smartass," among other things (that harm to the dog would mean "your ass is mine"), and Shirley told Boyer to "watch her cussing." *Id.*, at 02:30–03:10. Shirley threatened to charge Boyer with disorderly conduct, and she encouraged him to charge her "with fourteen of them." *Id.*, at 03:10–03:24. After telling Brumley to get her dog, Boyer told the officers to "take [her] to jail." *Id.*, at 03:24–03:50. Shirley and Boyer then walked toward the police cruiser. *Id.* Within two minutes of Shirley exiting his cruiser, Boyer was cuffed.

Once at the car, there was an initial struggle, while Boyer sort of fell into the vehicle (ostensibly in part due to her handcuffed state), and Shirley kept telling her to look away and to "get in the car." *Id.*, at 03:50–04:17. As Boyer went supine in the back seat, with her hands cuffed, she kicked or kicked toward Shirley. *Id.* He shouted to her, and Shepherd leaned in across Boyer and briefly sprayed pepper spray directly into her face. *Id.* She sat up with her feet in the floorboard, and the video soon ended as Shirley was about to close the door. *Id.* The final moments of the door closing on the vehicle are not captured. The parties characterize the kicking and closure sequence very differently. Boyer claims that, as she cooperatively attempted to get herself into the vehicle, Shirley slammed the cruiser door on her ankle, injuring it; she then kicked toward him, and Shepherd administered pepper spray to subdue Boyer. DE #84-2 at 218. Shepherd, however, did not see Shirley shut the door on Boyer's ankle at any point. DE #84-5 (Shepherd Dep.) at 36. Shirley likewise thought Shepherd's use of pepper spray was necessary under the circumstances to control an uncooperative and unruly Boyer. DE #110-1 (Shirley Dep.) at 48. The PCSD denies slamming the door on Boyer's ankle, intentionally or otherwise. DE #84-1 at 19–21.

The footage resumes with Boyer in the back of Shirley's cruiser, as Shirley looked into the car with a flashlight, entered it, and transported Boyer to the Pulaski County Detention Center (PCDC). Shirley BWC (Transport), at 00:00–00:30. When the sound picks up at roughly thirty seconds into the clip, Boyer's cries are audible, though the precise source of her lament is not entirely evident. *Id.* Shirley told Boyer that she should not have kicked an officer, and Boyer continued to cry, audibly saying "help me." *Id.*, at 00:30–00:45. The next few minutes continue uneventfully, with Boyer intermittently crying, and Shirley calling dispatch to obtain identifying information about Boyer. *Id.*, at 00:45–03:27. As the patrol car neared the PCDC, Shirley cautioned Boyer that, if she were aggressive toward him again, she would "get it worse." *Id.*, at

03:27–03:40. He then said that he would "get it [the pepper spray] off of [Boyer]" but she must cooperate. *Id.* Boyer replied that she was "hurting" and could not see, and Shirley advised that pepper spray "wasn't supposed to feel good." *Id.*, at 03:40–04:00. The patrol car then pulled into the jail garage. Shirley advised corrections officers on-scene that Boyer was "hitting," "spitting," and "drunk." *Id.*, at 04:00–04:30. He said she "tried" to kick him. *Id.* At one point, Shirley told the other officers that he had been planning to let her leave, but she "busted" an "attitude." *Id.*, at 05:00–05:20.

The next series of video clips captures the events that occurred within PCDC. *See* PCDC (Sally Port); PCDC (Short Hall); PCDC (Receiving); PCDC (Main Area); and PCDC (Desk Entry). PCDC Deputies Sharita Liner, Lila Coffman, and Niki West[4] were in the garage when Shirley arrived at PCDC with Boyer, and the above-described events unfolded. PCDC (Sally Port), at 9:58:57–10:00:36.[5] At one point, still in the garage, an unnamed corrections officer produced a spit mask. *Id.*, at 10:01:42–10:01:48. The group then attempted to get Boyer into the facility, and Coffman placed the spit mask on a partly uncooperative, emotional Boyer. *Id.*; *see also* PCDC (Receiving), at 10:02:12 (showing a slightly resisting Boyer walking into PCDC with a spit mask covering her face).

Coffman and West then walked Boyer into the Main Area, seating her in a restraint chair, with a spit mask visibly on Boyer. PCDC (Main Area), at 10:02:00–10:02:50. PCDC (actually Corhealth employee) Nurse Amy Parsons entered to evaluate Boyer within about three minutes of

---

[4] Together with Jailer David Moss, collectively the "PCDC Defendants."

[5] For each PCDC video, the Court references the timestamp visible on the clip itself. Part of the jail videos—from the shower area—are sensitive and filed under seal. DE #102 (Conventional Filing). The Court has reviewed them also.

Boyer's entry into the main area. *Id.*, at 10:05:45.[6] Though Parsons talked with Boyer for over five minutes, Parsons did not physically examine or otherwise touch Boyer, or specifically examine Boyer's ankle, in particular. *Id.*, at 10:05:45–10:11:10. The PCDC (Desk Entry) footage captures overlapping video from this period (with accompanying audio).

The shower sequence (PCDC (Personal Property Bath) and PCDC (Personal Property Main)) was eventful for these reasons: Boyer was agitated and had endured the pepper spray residuum for a significant period without relief. While in the shower, she obviously punched toward the shower curtain twice in response to the jail staff tossing rinse water onto her. PCDC (Personal Property Bath), at 10:15:37–10:15:40. This caused staff to remove and (mostly) forcibly dress her in the area. *Id.* Boyer is not fully cooperative in the process, and the women, as they exit the shower room, all go to the ground at one point out of the cameras' view. *Id.*, at 10:18:02 The record proof is that Plaintiff kicked at jailer Liner while on the ground. DE #92-4, at 4. Plaintiff claims no harm from this take down, and the Court sees none.

However, the group emerges from this area and moves Boyer back toward the main area. PCDC (Short Hall), at 10:18:22. Boyer obviously frees a hand and strikes Coffman in the face. *Id.* This leads to the women that surrounded Boyer immediately taking her again to the ground. *Id.* That fall buckled Boyer's ankle awkwardly, and she immediately and vociferously (as repeated throughout the night) claimed a broken ankle from the fall. *Id.*, at 10:18:32–10:19:13. Staff placed Boyer again in the restraint chair but did not otherwise strike, punch, or use violence toward Boyer after the punch by Boyer against Coffman. *Id.*, at 10:19:20

---

[6] Defendant Corhealth, for whom Parsons works, is the provider contracted to provide medical services at the PCDC.

Nurse Parsons refused Boyer's entreaties to go to the hospital over a lengthy period that night. The nurse treated the matter as "her call" and blamed either Boyer's violence toward staff or her need for suicide monitoring for the delay in hospital treatment. PCDC (Desk Entry), at 10:24:27–11:04:36. The suicide watch resulted from a staff intake interview—Boyer was, perhaps, ambivalent in response to the question of being suicidal. *Id.*, at 11:04:30. Parsons at one point expressly acknowledged that the ankle likely was broken, but she refused to send Boyer to the hospital. *Id.*, at 11:36:35. Boyer in fact never made it to the hospital while under PCDC custody.

By the day following Boyer's arrest and initial booking (*i.e.*, on March 25, 2017), the injured ankle was observed as bruised and swollen. DE #87-5 (Nurse's Note). Parsons recorded her (March 24) care steps, including administration of ibuprofen. *Id.* A physician's assistant examined Boyer the next day (March 26), ultimately ordering imaging of the ankle. DE #87-7 (PA's Orders). The x-ray, which occurred on March 27, revealed a "bimalleolar acute ankle fracture with displacement." DE #87-8 (Radiology Interpretation). The jail's medical staff cared for the injury at, some level at least, *see* DE #87-9, until Boyer's release from PCDC on March 29, 2017. DE #87-10 (Release Log).

Post-release, Boyer went to the hospital. DE #94-3 at 3. She soon had surgery to repair the broken ankle. *Id.* She also entered a guilty plea for felony assault regarding the kick against Deputy Shirley. *See* DE #84-10 (Docket History); Boyer Dep., at 217 (discussing plea in reference to Shirley assault).

Both the original Complaint (DE #1) and the Amended Complaint (DE #7) asserted various constitutional violations, including individual-capacity claims of unlawful arrest, excessive force, and inadequate medical care and official-capacity failure-to-train claims. Though the initial pleadings are not entirely clear as to which (if any) state claims Plaintiff brings, the briefing

confirms that Boyer endeavors a few. Pending are four motions to exclude two particular experts, and three (four, per the docket—but substantively three) summary judgment motions, one from each Defendant group. All matters are briefed.

### B.  MOTIONS TO EXCLUDE (DE ##86, 88, 89, 94)

The zealous evidentiary dispute, featuring input from all parties in some capacity, centers around two of Boyer's experts: Jacqueline Felts, a nursing professional expected to testify concerning the medical care that Boyer received at the jail, and William Harmening, a police practices expert expected to testify about the PCDC and PCSD Defendants' conduct. The Corhealth Defendants move to exclude Felts's and to limit Harmening's opinions (arguing that the latter improperly strays into medical territory). DE #86. Boyer responded (DE #103); Defendants replied (DE #111). The PCSD Defendants move to exclude Harmening (DE #88); that motion too is fully briefed. DE #104 (Response), 116 (Reply). The PCDC Defendants also move to exclude Harmening's opinion and testimony. DE #89 (Motion); DE #105 (Response). The Court essentially evaluates what, at this stage, would be proper testimony for consideration in the summary judgment context.

Lastly, the PCSD Defendants move to exclude Felts. DE #94 (Motion). Plaintiff does not oppose the motion. DE #106 (Response). The Court agrees that Felts's qualifications do not permit her to testify as to the PCSD Defendants' conduct during and surrounding the arrest; further, as to the issue of whether the PCSD Defendants' caused Boyer's ankle injury, Felts can offer no helpful (or personal-knowledge-based) opinion. Indeed, Felts testified that she does not intend to offer any criticism of the PCSD Defendants' conduct in this case. Accordingly, the Court **GRANTS**

unopposed DE #94. The Court will not here consider, or permit at trial, any Felts testimony about the PCSD Defendants' care or treatment of Boyer or alleged role in causing the ankle injury.[7]

[To be clear, and because this directly affects other parts of the case, the Court factually rejects any claim that Shirley broke or injured Boyer's ankle. The Court must give all video its fair due—Boyer simply does not limp or indicate any ankle injury in the jail videos prior to the takedown in the IRC Short Hall. She walks on her own (and with no evident ankle limitation) in the sally port, in the booking area, to the shower area, and in the shower area. The hall takedown sharply changed things. From that point, Boyer can place no weight on her right ankle, and she is in tremendous pain with respect to that extremity. Despite the incongruous claims to the contrary, no reasonable juror could attribute the ankle injury to Shirley and the arrest, or to any event other than the hall tackle. As such, and at every point it matters, the Court finds that the ankle claim, as to Shirley, fails. The arrest video is entirely consistent with this view—that Boyer had already kicked Shirley and then was simply sitting upright in the car when he was about to close the door in normal fashion. Boyer plainly claims a door slam caused her broken ankle, but the record—the indisputable video—forecloses that theory as a matter of law. Certainly, this finding affects the credibility of Boyer (and likely her experts too), but this ruling is not a credibility finding but a nod to the video and the only rational findings that can result from review of the full field of proof.]

*Daubert v. Merrell Dow Pharm., Inc.*, 113 S. Ct. 2786 (1993), "established a general gatekeeping . . . obligation for trial courts[,]" requiring them "to exclude from trial expert

---

[7] Consistent with this reasoning, and the parties' agreed exclusion scope, the Court strikes the portions of Felts's Amended Report suggesting that the PCSD Defendants actually caused Boyer's ankle injury. *See, e.g.*, DE #103-3 at 2 (reporting that "the squad car door was slammed on [Boyer's] foot/ankle" during the arrest), 4 (suggesting that the PCSD Defendants may have purposefully caused the door to slam on Boyer's ankle).

testimony that is unreliable and irrelevant. *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002). Rule 702 lays out the framework, providing:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. *Daubert* provides a non-exhaustive list of factors relevant to the analysis: "(1) whether the theory or technique has been tested and subjected to peer review and publication, (2) whether the potential rate of error is known, and (3) its general acceptance. *Conwood* Co., 290 F.3d at 792. The calculus ultimately "is a flexible one, with an overarching goal of assessing the [ ] validity and thus the evidentiary relevance and reliability of the principles and methodology underlying the proposed expert testimony." *Id.* (quoting *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001)).

Rule 702 applies equally to scientific and non-scientific expert testimony. *Kumho Tire Co. v. Carmichael*, 119 S. Ct. 1167, 1174 (1999). "With respect to the individual factors enumerated in *Daubert*, the *Kumho* Court held that trial courts may consider such factors when assessing the reliability of all types of expert testimony." *First Tennessee Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001)." In some cases (even cases involving non-scientific expert testimony), the factors may be pertinent, while in other cases the relevant reliability concerns may focus upon personal knowledge or experience." *Id.* (quotation marks omitted). "[W]hether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.* (quotation marks omitted). Ultimately,

Rule 702 foundationally ensures that "the witness must be qualified[,] . . . the testimony must be relevant, . . . [and] the testimony must be reliable." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008). The proponent of the expert opinion must establish its admissibility by a preponderance of the evidence. *See Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001).

The Court addresses the admissibility of, and the various arguments against, each expert's opinions in turn.

*Jacqueline Felts*

Felts is a long-term, acute critical care nurse at the Commonwealth Regional Specialty Hospital and a clinical nursing instructor in the Associate's Degree program at Western Kentucky University, where Felts earned a Master's degree in nursing science in 2016. DE #86-2 (Felts Dep.) at 22–24; DE #43-2 (Felts CV). The Corhealth Defendants first argue that Felts is unqualified to opine as to the standard of care applicable in this scenario because she has never worked in a correctional setting and does not, it appears per her testimony and CV, have experience treating the specific injuries Boyer sustained in this case.[8] In the Court's view, these deficiencies bear on the weight Felts's testimony should receive, rather than its baseline admissibility.

"The relevancy bar is low, demanding only that the evidence logically advances a material aspect of the proposing party's case." *United States v. LaVictor*, 848 F.3d 428, 442 (6th Cir. 2017)

---

[8] Defendants also briefly suggest that Felts is unqualified in part because she seemed confused by the "reasonable degree of medical certainty" line of questioning in her deposition. DE #86-2 at 158–161. In context of the full deposition and in light of Felts's education, credentials and licensure, and practical experience in the nursing field, this relatively brief apparent confusion about terminology does not materially undermine her basic qualification to render an expert nursing opinion in this case. Defendants can probe Felts's understanding of particular medical concepts (whether in a practical or academic context) as they relate to the weight of her opinion and testimony about any given subject.

(quotation marks omitted). Importantly, "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact[,]" and "rejection of expert testimony is the exception, rather than the rule." *Id.* (quotation marks and citation omitted). Felts's testimony may assist a jury, to a degree, in assessing (from a nursing perspective) the actions that jail medical staff took, the timing of their responses, and the completeness and thoroughness of their treatment of Boyer. Felts's experience and credentials which demonstrate recent, multifaceted (involving both practical and instructional roles) acute-care nursing experience, clear the relatively low Rule 702 bar for qualification and helpfulness purposes. Further, though she concedes she has not worked in any correctional setting, Felts notes that she has dealt with combative or less-than-cooperative patients. DE #83-2 at 36.

Though certainly nonbinding, the Eleventh Circuit's position on an analogous topic, as Plaintiff advocates, is persuasive. *See McDowell v. Brown*, 392 F.3d 1283, 1296 (11th Cir. 2004) ("The standard of care applicable to nurses is universal, and does not diminish when the setting is a jail rather than hospital."). Though the Court does not go so far as to endorse the described "universal" character of nursing expertise, the Court agrees that, under the circumstances of this case, there is also no legitimate "reason to differentiate between jail nurses and hospital nurses" in determining whether Felts's proposed assistance clears the minimum Rule 702 threshold. Parsons is a nurse, and Felts is qualified to critique her treatment of Boyer.

Similarly, that Felts has not specialized in the type of injuries Boyer suffered does not require exclusion.[9] *Cf. id.* (quoting *Gaydar v. Sociedad Instituto Gineco–Quirurgico y Planifacacion*, 345 F.3d 15, 24 (1st Cir. 2003)) ("The proffered physician need not be a specialist

---

[9] Indeed, it is unlikely that even a correctional facility nurse expert would have specialization in ankle injuries. Like a non-specialized hospital nurse, logic would suggest that most correctional nurses must be generalists.

in the particular medical discipline to render expert testimony relating to that discipline."); *see also In re Heparin Prod. Liab. Litig.*, 803 F. Supp. 2d 712, 747 (N.D. Ohio 2011), *aff'd sub nom. Rodrigues v. Baxter Healthcare Corp.*, 567 F. App'x 359 (6th Cir. 2014) (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995)) ("'But a doctor need not be a specialist in the exact area of medicine implicated by the plaintiff's injury.' . . . So long as the expert has some specialized knowledge as a result of training or experience relevant to the opinions he offers, his testimony will meet the qualification requirement."); *Warren v. Prison Health Servs., Inc.*, 576 F. App'x 545, 560 (6th Cir. 2014) ("Ms. Warren relies, in part, on the expert-witness testimony of a cardiologist. Shilling attempts to diminish this testimony because the expert is not a nurse and is based in Connecticut—not Michigan . . . These arguments, too, simply go to the weight of the evidence."). Accordingly, the Court finds Felts adequately qualified under Rule 702; though Defendants' arguments concerning the differences between Felts's treatment experience and the circumstances of this case (involving Parsons) may provide fertile ground for impeaching Felts's conclusions, such arguments relate more to the weight of her testimony than to Felts's qualifications for offering it. *Cf. Sanford v. Stewart*, No. 5:11CV2360, 2013 WL 3729175, at *4 (N.D. Ohio July 12, 2013) (quoting *Morales v. American Honda Motor Co., Inc.*, 151 F.3d 500, 516 (6th Cir. 1998)) ("The fact that a proffered expert may be unfamiliar with pertinent statutory definitions or standards is not grounds for disqualification. Such lack of familiarity affects the witness' credibility, not his qualifications to testify."); *see also Daubert*, 113 S. Ct. at 2798 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Second, the Corhealth Defendants argue that Felts based her opinions (in both versions of the report) on an incomplete and at times inaccurate reading of the evidentiary record, rendering them unreliable. Rule 702 conditions admissibility in part on whether an "expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Felts espouses certain principles about prevailing nursing practice standards. She identified the standard that she applied. DE #103-2 at 2 (Initial Report); 103-3 at 3 (Amended Report). To be admissible, Felts's conclusions must reliably apply those principles to the facts, even if she resolved disputes in one party's favor based on her review.

Characterized broadly, Defendants argue: that Felts failed to review even a minimum portion of the record before rendering her opinions; and that, because Felts admitted in her deposition that she misunderstood or incorrectly perceived certain facts that she based her opinions upon, the opinions are inherently unreliable. "The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal*, 527 F.3d at 529–30. It is not strictly essential that an expert have extensive familiarity, as hypothetical-based opinions are often permitted. But even "[h]ypothetical questions" posed to experts "must be based on facts supported by the evidence[.]" *Ranger, Inc. v. Equitable Life Assurance Soc.*, 196 F.2d 968, 973 (6th Cir. 1952).

Expert conclusions expressly founded upon incorrect factual assumptions would be inherently unreliable. *See Rose v. Truck Centers, Inc.*, 388 F. App'x 528, 535 (6th Cir. 2010) ("Expert testimony may not be based on mere speculation, and assumptions must be supported by evidence in the record.") (citation omitted). The Court thus grants Defendants' motion, to the extent they seek to strike from the current record opinions tied solely to since-retracted or

otherwise indisputably inaccurate factual views (*e.g.*, Felts's comments about the lack of pharmacological intervention, *see* DE #83-2 at 88); the Court does not consider such opinions here. At trial, there ultimately must be some factually supported tie between any Felts opinion and the established record. However, to the extent Defendants seek to exclude Felts in her entirety, the Court denies the motion. The Court does not view Felts's relative familiarity with the record of this case as preliminarily disqualifying; Felts's obvious confusion about some facts does not, necessarily, render all of her opinions unreliable. Rather, such issues go to weight. Defendants may explore any inaccuracies in either of Felts's reports and her deposition testimony, as well as any inconsistencies between her presumed facts and the record, on cross. Felts has criticisms of Parsons that, contested as they may be, will help the jury understand the facts and render an appropriate decision. Case issues of proper triaging, proper hospital referral, warranted or unwarranted delay, and emergent nursing call for expertise, and Felts provides it at a qualifying and relevant level.

Accordingly, the Court **GRANTS in part** and **DENIES in part** DE #86, as it pertains to Felts.

### William Harmening

Harmening is a former police academy instructor with over thirty years of law enforcement experience. He is also a current adjunct professor and coordinates the Forensic Psychology certificate program at Washington University in St. Louis, Missouri. DE #88-3 (Initial Report); DE #103-4 (Harmening CV). Harmening's materials specify his precise experience with and authorship related to excessive force issues, and he has provided expert opinions in roughly forty excessive force cases. DE #103-4. Harmening concedes, though, that he has no medical training.

15

Parsons and Corhealth thus ask the Court to limit Harmening's testimony to ensure that it does not enter medical territory. Defendants contend, and the Court agrees, that Harmening is unqualified to offer expert testimony about medical care. *See* DE #86-3 at 233–36 (Harmening admitting that he has no medical training). As Harmening lacks specialized medical knowledge, and is not experienced in the field of nursing, he may not offer any opinion as to what Parsons should have perceived or done under the circumstances. Harmening, as an expert knowledgeable about police practices and police-citizen encounters, does not have any particularized, experience-based information to add that would help a jury assess a jail nurse's care. And, though Plaintiff argues that Harmening's understanding of medical intervention from a law enforcement standpoint qualifies him to discuss medical matters in this case, such opinions would be irrelevant to the questions presented and thus unhelpful to the jury; Plaintiff brings no medical claims against the officers (PCSD or PCDC), and, as discussed, Harmening may not offer any opinion about Parsons's medical care and response in this case. To the extent he does so (*e.g.*, in assessing what Parsons should reasonably have perceived and then done upon seeing Boyer walk into the facility), the Court does not consider the report.[10] The Court thus **GRANTS** the DE #86 motion **in part**, as to Harmening offering medical testimony.

Next, the PCSD Defendants take issue with the recency of Harmening's patrol experience and, in the same vein, the areas of his expertise (namely, they argue, centered around securities and investment fraud). They thus argue that he is unqualified to testify about excessive force issues. Though "unqualified individuals [may] not broadly testify about an area in which they possessed no specialized knowledge[,]" a person may "testify as an expert about some aspect of police affairs" where he has sufficient knowledge and experience. *Champion v. Outlook Nashville, Inc.*,

---

[10] This includes Harmening's third conclusion. *See* DE #83-3 at 15.

16

380 F.3d 893, 908 (6th Cir. 2004). Harmening's résumé, specifically identifying each relevant experience with police use of force standards, demonstrates, as part of Boyer's showing, by a preponderance that he has the requisite specialized knowledge to testify about them. As an illustrative example of Harmening's experience, within the last five–seven years, he has taught college courses in forensic psychology and crisis intervention (each containing force units), as well as in criminology and correctional psychology. DE #88-2 at 2–3. He has also contributed to peer-reviewed publications discussing use of force. *Id.* at 1. Together with Harmening's extensive police academy instruction experience and earlier individual patrol experience (even if the latter is somewhat dated), such training and education clear the Rule 702 qualification hurdle.[11] *See Champion*, 380 F.3d at 908 (6th Cir. 2004) (finding the facts that a proposed expert had a "PhD in sociology from Washington State University, [was] employed by the University of South Carolina's Department of Criminology, [taught] classes on police procedures and practices . . . [and] ha[d] authored forty to fifty articles on the subject of police procedures, many of which ha[d] appeared in peer-reviewed journals" as amply sufficient to render him qualified to testify).

The PCSD Defendants next argue that Harmening's opinions improperly offer legal conclusions (such as Harmening's belief that Boyer's arrest was unlawful, or that they used an unreasonable amount of force in arresting her, *see* DE #88-3 at 15). Of course, "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). But, the issue

---

[11] The two cases Defendants attach, where courts excluded Harmening, centrally discussed his lack of experience or training in blood spatter, wounds, weapons, and ballistics work (and similar areas). Though incidentally mentioning the plaintiffs' desire to elicit force testimony, neither opinion discusses his qualification for force testimony, specifically, in any detail. The blood, crime scene, and bullet issues are not in play here. And, though the excluding courts noted Harmening's primary expertise in psychology and securities (certainly true), the record in this case (namely, Harmening's CV, as bolstered by his testimony and history) substantiates that Harmening is adequately qualified in force usage and policing to provide expert testimony about apt areas of each.

embraced must be factual, rather than legal. For example, an expert could "not testify [ ] that the lax discipline policies of . . . [a police department] indicated that the [c]ity was deliberately indifferent to the welfare of its citizens," though the expert could describe his views of the practices and explain the consequences of the laxity he perceived. *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994). Similarly, courts "would not allow a fingerprint expert in a criminal case to opine that a defendant was guilty (a legal conclusion), even though [they] would allow him to opine that the defendant's fingerprint was the only one on the murder weapon (a fact)." *Id.* "The distinction, although subtle, is nonetheless important." *Id.*

Harmening's conclusions embrace ultimate factual issues—whether the PCSD Defendants had an empirical basis for arresting Boyer, and whether they used more force than necessary in Harmening's view in effectuating the arrest. Harmening may not give an opinion about probable cause (a legal conclusion) or Fourth Amendment force contours (also legal). He may, however, comment on what the officers encountered, what the factual situation included, and whether Boyer factually presented in a manner that was disorderly or impaired. Harmening also may discuss *Graham*-pertinent elements—risks presented, law enforcement needs, and the impact of Boyer's custody on the justification for or decision to employ additional force. His testimony regarding recognized policies and standards also would be proper.  Harmening's opinions, as limited, fairly concern the underlying factual questions.[12]

---

[12] That Harmening uses terms like "excessive force" does not in and of itself drive his report into improper legal territory. Such a term has a blended legal and lay meaning, grounded in reasonableness, and Harmening must reasonably be able to use commonly understood words like "excessive" in describing his view of the force in this case. Use of commonly understood terminology best assists the trier of fact in digesting the expert opinion and its foundation. *Cf. United States v. Lay*, 612 F.3d 440, 448 (6th Cir. 2010) (noting that even "[a] lay witness may testify to a legal conclusion that does not involve terms with a separate, distinct and specialized meaning in the law different from that present in the vernacular") (quotation marks omitted).

Lastly, the PCSD Defendants challenge the reliability and evidentiary foundation for Harmening's conclusions. As previously discussed in relation to Felts, an expert witness may resolve factual disputes in favor of one side, but there still must be some basic, reliable evidentiary foundation for the opinion. Contrary to Defendants' position, there is at least minimally adequate record support for Harmening's conclusions regarding the officers' conduct during the arrest and the threat Boyer posed (or did not pose) to officers. Harmening is entitled to view the facts and resolve inferences in Plaintiff's favor in grounding his opinions. Defendants are free to challenge Harmening's factual take on cross or via contrary evidence. The fact that he may have interpreted some of the evidence in a manner different from Defendants, or even inaccurately, does not make his report inherently unreliable in toto. Accordingly, the Court **DENIES** the PCSD Defendants' motion to exclude Harmening (DE #88) on these grounds.

Lastly, the Court confronts the PCDC Defendants' motion to exclude Harmening. They argue that his qualifications and experience are not relevant to the correctional setting, that his opinions improperly state legal conclusions and invade the factual and decisional province of the jury, and that his opinions are unreliable, irrelevant, and prejudicial. The Court need not go beyond the first contention, as it agrees: Boyer has not demonstrated, by a preponderance, that Harmening has sufficient specialized knowledge in the correctional setting to support his qualification to testify against the PCDC Defendants. *See Champion*, 380 F.3d at 908–09 (emphasizing that a police expert may testify "concerning a discrete area of police practices about which he ha[s] specialized knowledge"). Harmening has not worked in a correctional setting or attended training on the subject in many years. *See* DE #89-5 at 42. And, though Harmening has taught corrections courses at Washington University, his testimony describes general instruction about correctional philosophy, psychology, and roles and structures. There is no evidence that Harmening has

19

specialized knowledge or experience concerning policing in the correctional facility context. The Court thus finds, per Rule 702, the proposed Harmening correctional opinions unhelpful to the jury, as they are based in insufficient specialized professional experience. Further, the Court's resolution of the PCDC claims largely eliminates this area from consideration anyway. Accordingly, the Court **GRANTS** DE #89.

The Court thus considers the opinion proof, as delimited, in the summary judgment evaluation.

### C.  SUMMARY JUDGMENT MOTIONS (DE ##84, 87, 91[13])

#### 1.  Rule 56 Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings,

---

[13] Though technically pending as an independent motion, DE #92 simply provides the exhibits intended to accompany the DE #91 summary judgment motion. The two filings are, functionally, a single relief request. Further, the respective dispositive motion responses / replies can be found in the docket at: DE #84 [PCSD Defendants' Mot.], 110 (Resp.), 113 (Reply); DE #87 [Corhealth Defendants' Mot.], 108 (Resp.), 112 (Reply); DE #91 [PCDC Defendants' Mot.], 92 (Exhibits), 107 (Resp.), 115 (Reply). The Court has reviewed and accounted for all filings with care.

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552; *see also id.* at 2557 (Brennan, J., dissenting) ("If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." (emphasis in original)).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for

trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444-45 (6th Cir. 2006).

### 2. Analysis

#### i. Immunity Standards

"Qualified immunity shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Barton v. Martin*, 949 F.3d 938, 947 (6th Cir. 2020) (quoting *Harlow v. Fitzgerald*, 102 S. Ct. 2727, 2738 (1982)). Qualified immunity protects an officer unless the plaintiff demonstrates that "(1) there is a genuine dispute of material fact as to whether the official deprived her of a constitutional right, and (2) the right was clearly established at the time of the official's actions such that a reasonable official would have known that her actions were unconstitutional." *Hicks v. Scott*, 958 F.3d 421, 430 (6th Cir. 2020). The Court may address the two prongs in any sequence. *See id.*

"A right is clearly established when the 'contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Barton*, 949 F.3d at 947 (6th Cir. 2020) (quoting *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009) (citation omitted)). That is, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 947–48. "After a defending officer initially raises qualified immunity, the plaintiff bears the burden of showing that the officer is not entitled to qualified immunity." *Id.* at 947. At bottom, the doctrine "allows police officers breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (quotation marks omitted).

Similarly, Kentucky's equivalent[14] of qualified immunity protects officers that make "good faith judgment calls [ ] in a legally uncertain environment." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). Specifically, it protects officers for "(1) discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment . . . (2) [made] in good faith; and (3) within the scope of the employee's authority." *Id.* "[B]ad faith can be predicated on a violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position, *i.e.*, objective unreasonableness[.]" *Id.* at 523.

Further, sovereign immunity here bars any official-capacity claims on the state front. *See Schwindel v. Meade Cty.*, 113 S.W.3d 159, 163 (Ky. 2003). Plaintiff has not alleged waiver in this context. In their official capacities as state representatives, Defendants thus enjoy absolute immunity. *See Yanero v. Davis*, 65 S.W.3d 510, 521–22 (Ky. 2001) ("Official immunity can be absolute, as when an officer or employee of the state is sued in his/her representative capacity, in which event his/her actions are included under the umbrella of sovereign immunity . . . [W]hen an officer or employee of a governmental agency is sued in his/her representative capacity, the officer's or employee's actions are afforded the same immunity, if any, to which the agency, itself, would be entitled[.]"). On the federal side, the official-capacity claims are, functionally, claims against the municipal government (Pulaski County) and must proceed via *Monell v. Dep't of Soc. Servs. of City of New York*, 98 S. Ct. 2018 (1978). *See Kentucky v. Graham*, 105 S. Ct. 3099, 3105 (1985) ("Official-capacity suits . . . generally represent only another way of pleading an action

---

[14] Plaintiff (albeit loosely) maintains state versions of the relevant claims, and the Court examines them under Kentucky law. *See, e.g.*, *Menuskin v. Williams*, 145 F.3d 755, 761 (6th Cir. 1998) ("A federal court exercising supplemental jurisdiction is bound to apply the [substantive] law of the forum state[.]").

against an entity of which an officer is an agent . . . [A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.") (quotation marks and citation omitted); *id.* at 3106 n.14 ("There is no longer a need to bring official-capacity actions against local government officials, for under *Monell*, *supra*, local government units can be sued directly for damages and injunctive or declaratory relief.").

### ii.   Claims Against PCSD Defendants (Counts 1, 2, 3, and 5)

#### 1.   § 1983 and State False Arrest / Imprisonment and Malicious Prosecution Claims

"When a false-imprisonment claim arises out of an alleged false arrest—as it does in this case—those claims are identical," and courts address them jointly. *Weser v. Goodson*, 965 F.3d 507, 513 (6th Cir. 2020). All three of these claims, whether brought under federal or state law, hinge on whether probable cause existed, under the Fourth Amendment, to arrest Boyer. *See Frodge v. City of Newport*, 501 F. App'x 519, 526 (6th Cir. 2012) ("In order for a plaintiff to prevail on a theory of wrongful arrest under § 1983, he must prove that the police lacked probable cause."). "A plaintiff's Fourth Amendment rights are not violated if an officer does not have an arrest warrant so long as 'probable cause exists for the arresting officer's belief that a suspect has violated or is violating the law.' *Id.* (quoting *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988)). In evaluating probable cause, the Court looks at the totality of the circumstances, from the perspective of a reasonable on-scene officer. *Id.*

"Probable cause 'means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Id.* (quoting *Estate of Dietrich v. Burrows*, 167 F.3d 1007, 1010–11 (6th Cir. 1999)). Probable cause is a flexible, common-sense inquiry, and it "requires only 'a "fair probability" that

24

the individual to be arrested has either committed or intends to commit a crime.'" *Id.* (quoting *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002) (internal citation omitted)). "Mere speculation that a crime occurred," however, "is insufficient to establish probable cause." *Id.* at 526–27 (citing *McCurdy v. Montgomery Cnty., Ohio*, 240 F.3d 512, 519 (6th Cir. 2001)).

Likewise, in Kentucky, "there is no distinction between the torts of false arrest and false imprisonment; the legal analysis is the same" in the arrest context. *Ming Wen Chen v. Pawul*, No. 2016-CA-001860-MR, 2018 WL 3814764, at *2 (Ky. Ct. App. Aug. 10, 2018) (citing *Lexington-Fayette Urban County Gov't v. Middleton*, 555 S.W.2d 613 (Ky. App. 1977)); *Dunn v. Felty*, 226 S.W.3d 68, 71 (Ky. 2007) (recognizing "that every confinement of a person is an imprisonment, whether it occurs in a prison or a house," and thus "refer[ring] to the torts of false imprisonment and false arrest together as false imprisonment"). "False imprisonment is the intentional confinement or instigation of confinement of a plaintiff of which confinement the plaintiff is aware at the time." *Dunn*, 226 S.W.3d at 71. The central inquiry is whether there existed legal authority for the confinement:

> An action for false imprisonment may be maintained where the imprisonment is without legal authority. But, where there is a valid or apparently valid power to arrest, the remedy is by an action for malicious prosecution. The want of lawful authority is an essential element in an action for false imprisonment. Malice and want of probable cause are the essentials in an action for malicious prosecution.

*Smith v. Stokes*, 54 S.W.3d 565, 567 (Ky. Ct. App. 2001) (quoting *SuperX Drugs of Kentucky, Inc. v. Rice*, 554 S.W.2d 903 (Ky. Ct. App. 1977)).

"Two common examples of a law enforcement officer's privilege to detain an individual are (1) an arrest pursuant to a warrant or (2) an arrest without a warrant in which the officer has probable cause, that is, reasonable objective grounds to believe that a crime was committed and that the plaintiff committed it." *Dunn*, 226 S.W.3d at 71. Kentucky's probable cause standard

25

mirrors the federal standard. *See Williams v. Commonwealth*, 147 S.W.3d 1, 7 (Ky. 2004). "If an officer has probable cause to arrest, Plaintiffs cannot maintain an action for false arrest." *Hartman v. Thompson*, 931 F.3d 471, 483 (6th Cir. 2019) (citing Dunn, 226 S.W.3d at 71).

The Court finds a triable question on the propriety of Boyer's arrest. Shirley cuffed Boyer within two minutes of him exiting the cruiser. His stated precipitating reason was for alcohol intoxication and that she "became very belligerent." DE #84-11 (Police Report) at 6. Alcohol intoxication is an arrestable offense under Kentucky law. KRS 222.203(1). The offense itself has the following definition:

> A person is guilty of alcohol intoxication when he appears in a public place manifestly under the influence of alcohol to the degree that he may endanger himself or other persons or property, or unreasonably annoy persons in his vicinity.

KRS 222.202. The disorderly conduct statute, KRS 525.060, provides:

> A person is guilty of disorderly conduct in the second degree when in a public place and with intent to cause public inconvenience, annoyance, or alarm, or wantonly creating risk thereof, he:
>
> (a)    Engages in fighting or in violent, tumultuous, or threatening behavior;
>
> (b)    Makes unreasonable noise; . . . .

Here, at the time Shirley cuffed Boyer, no other offenses could plausibly apply.

The Court believes the video, the record, and the applicable standards require a jury evaluation of at least the historical facts pertinent to probable cause. The factual version taken favorably to Boyer, and in light of the video, suggests that she was not "manifestly" under the influence and certainly not behaving in a way that demonstrated danger to anyone or annoyance to others. On the video, she arguably was responsive, calm (until arrest), under control, and clear in her communications. Further, none of the disorderly conduct second triggers appears to apply,

26

at least before the arrest. The Court treats the moment when Shirley cuffed Boyer as the clear mark of arrest.

Several notes pertain: First, Shirley's arrest report is of debatable accuracy. He claims Boyer "flagged" him down; she denies this. *Compare* DE #84-11 at 6, *with* Boyer Dep. at 59. Further, he says "Boyer was slurring her speech, unsteady on her feet, and appeared to be manifestly under the influence of alcohol." DE #84-11 at 6. A jury could reasonably reject each and all of these perceptions. *Jones v. Clark Cty., Kentucky*, 959 F.3d 748, 757 (6th Cir. 2020) (discussing summary judgment in probable cause context: "Unless 'there is only one reasonable determination possible,' this is a jury question" (citation omitted)). Further, Boyer simply did not, per the video, "refuse" to give Shirley identification.

The Court finds it significant that Shirley focused on Boyer and evidently ignored the very compromised Brumley, also on the scene. A jury could view Shirley as motivated not by Boyer's criminal activity but rather by her non-deferential attitude. He said as much at the jail, remarking that he would have let Boyer go but she "busted an attitude" with him. Shirley BWC (Transport), at 05:00–05:20. He had almost immediately warned her to "lose" her attitude and later warned her to "lose" the attitude or go to jail. Shirley BWC (Arrest Video), at 02:19–02:30. An arrest decision hinges on probable cause, not the demeanor or obeisance of an encountered citizen. Boyer, free at the moment of initial confrontation, had the right to express concerns about her dog and arguably had no obligation to converse, pleasantly or otherwise, with Shirley. A jury could reject any reasonable basis for arrest and thus must resolve the historical facts regarding probable cause. *See Haley v. Elsmere Police Dep't*, 452 F. App'x 623, 628 (6th Cir. 2011) ("Accepting Haley's version of the facts, a reasonable officer could not have found the elements of the statutory offense of alcohol intoxication.").

The same is true for the Kentucky disorderly conduct offense.[15] A juror could fairly conclude from the video that a reasonable officer could not have perceived probable cause to arrest Boyer for disorderly conduct, based on the offense elements. *See* KRS § 525.060(1) (outlining the Kentucky disorderly conduct offense). Given the arguable lack of probable cause, and the factual disputes underlying the outcome, qualified immunity is not proper at this stage. A jury must determine whether a constitutional violation occurred during the arrest process. And, needless to say, it was clearly established in March 2017 that officers may not arrest citizens, seizing them for Fourth Amendment purposes, without either a warrant or probable cause. The parallel state claims get like treatment. Accordingly, the state and federal false arrest / imprisonment claims survive summary judgment.

Lastly, the Court addresses the malicious prosecution claim. "[T]o succeed on a [Fourth Amendment] malicious prosecution claim, a plaintiff must prove: (1) the defendant made, influenced, or participated in the decision to prosecute the plaintiff; (2) there was no probable cause for the prosecution; (3) as a consequence of the legal proceedings, the plaintiff suffered a deprivation of liberty apart from the initial arrest; and (4) the criminal proceeding was resolved in the plaintiff's favor." *France v. Lucas*, 836 F.3d 612, 625 (6th Cir. 2016). The same general framework applies in Kentucky. A party claiming malicious prosecution must show: "(1) [T]he institution or continuation of original judicial proceedings . . . , (2) by, or at the instance, of the

---

[15] The Court looks at any conceivable offense that a reasonable officer under the circumstances could have found probable cause to arrest for. *See Warren v. Lexington-Fayette Urban Cty. Gov't Police Dep't*, No. CV 5: 16-140-DCR, 2017 WL 2888716, at *4 (E.D. Ky. July 6, 2017) (discussing *Devenpeck v. Alford*, 154, 125 S. Ct. 588, 594 (2004)) (quotation marks omitted) ("[T]here is no requirement that the offense establishing probable cause [ ] be closely related to, and based on the same conduct as, the offense identified by the arresting officer at the time of arrest."). Here, no potential arrestable Kentucky offense indisputably offers probable cause to shield Shirley from liability on the arrest front.

plaintiff, (3) the termination of such proceedings in defendant's favor, (4) malice in the institution

of such proceeding, (5) want or lack of probable cause for the proceeding, and (6) the suffering of

damage as a result of the proceeding." *Craycroft v. Pippin*, 245 S.W.3d 804, 805 (Ky. Ct. App.

2008).

Boyer does not address any element of the malicious prosecution claim, beyond probable

cause. Summary judgment survival requires more, in response to Defendants' well-supported

motion. The Court thus dismisses this under-developed sub-claim. Accordingly, for the reasons

discussed, the Court **GRANTS** DE #84, **in part**, as to the malicious prosecution claim, but

**DENIES** it as to the state and federal false arrest / imprisonment claims.

 With that said, the Court also must note the important limits on the claim. Boyer pleaded

guilty to assaulting Shirley, a crime that happened within moments of the initial arrest. *See* DE

#84-10 (Docket History). She makes suggestions about plea validity, but this federal civil action

cannot undercut the validity of a state criminal conviction. *See Heck v. Humphrey*, 114 S. Ct. 2364,

2372 (1994) ("We think the hoary principle that civil tort actions are not appropriate vehicles for

challenging the validity of outstanding criminal judgments applies to § 1983 damages actions that

necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement[.]").

Thus, the arrest itself is triable here, but Boyer indisputably committed a crime almost

immediately. This crime, giving probable cause from that point forward, thus sets a stark boundary

on the contours of the claim. The parties are so advised.

### 2.  § 1983 Excessive Force Claim

The Fourth Amendment typically governs excessive force claims. "When a free citizen

claims that a government actor used excessive force during the process of an arrest, seizure, or

investigatory stop, we perform a Fourth Amendment inquiry into what was objectively

'reasonable' under the circumstances." *Coley v. Lucas Cty., Ohio*, 799 F.3d 530, 537 (6th Cir. 2015). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 109 S. Ct. 1865, 1872 (1989). This inquiry "is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* The Court's handling of the facts must account "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* In assessing those circumstances, the Court centrally considers "three main factors: (1) the severity of the crime at issue, (2) whether the suspect pose[d] an immediate threat to the safety of the officers or others, and (3) whether [the suspect was] actively resisting arrest or attempting to evade arrest by flight." *Hicks*, 958 F.3d at 435 (quotation marks omitted) (alteration in original).

The two alleged force incidents here are: (1) the pepper ("OC") spray use; and (2) the alleged door-slamming on Boyer's ankle. The Court considers the reasonableness of each distinct force use separately. *See Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996) (collecting cases that have "analyze[d] excessive force claims in segments"). Thus, though the Court evaluates "the totality of the circumstances to determine whether the force used was reasonable" in each instance, *see id.*, it confines the applicable circumstances to those surrounding the particular use of force at issue. *See also Chappell v. City of Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009) (directing a "segmented analysis of the totality of the circumstances facing the detectives at the time they made their split-second judgments immediately prior to" the particular force usage) (quotation marks omitted). Lastly, where there is (as is the case here) footage of the at-issue

30

incidents, the Court must view the other facts of record "in the light depicted by the videotape." *Green v. Throckmorton*, 681 F.3d 853, 862 (6th Cir. 2012).

"[T]here must exist an objective justification for the use of pepper spray." *Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 774 (6th Cir. 2004). As early as 1994, the Sixth Circuit "held that police who repeatedly sprayed mace in the face of an unarmed plaintiff who was not resisting and was not subject to lawful arrest would be liable for excessive force as a matter of law." *Id.* (discussing *Adams v. Metiva*, 31 F.3d 375, at 384–87 (6th Cir. 1994)). Use of OC spray on an immobilized, unresisting arrestee, who cannot flea and poses no threat, is unreasonable as a matter of law. Such had been true for some time prior to the events of this case. *Batson v. Hoover*, 355 F. Supp. 3d 604, 614 (E.D. Mich. 2018), *aff'd*, 788 F. App'x 1017 (6th Cir. 2019) ("It has been well settled law in this circuit for quite some time that [one] . . . who maces an unresisting, handcuffed prisoner without provocation, not in response to any plausible disciplinary exigency, commits an unreasonable use of force and is not entitled to qualified immunity."); *Champion*, 380 F.3d at 903 (observing that, in 2004, it was "clearly established that the [ ] use of pepper spray against [an arrestee] after he was handcuffed and hobbled was excessive").

There is a clearly established constitutional line as to this type of force. Thus, as the Sixth Circuit has noted:

> As a general rule, we have held that the use of pepper spray is excessive force when the detainee "surrenders, is secured, and is not acting violently, and there is no threat to the officers or anyone else." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004). . . . The logical corollary to this rule is that there is a very limited class of circumstances when the use of pepper spray is proper, including where a detainee is unsecured, acting violently, and posing a threat to himself or others. In *Monday v. Oullette*, 118 F.3d 1099 (6th Cir. 1997), for example, we found proper the use of pepper spray where the victim needed to be subdued to prevent a danger to himself. *Id.* at 1104–05. In *Gaddis v. Redford Twp.*, 364 F.3d 763, 774 (6th Cir. 2004), we found the use of pepper spray to be reasonable when officers feared than an arrestee, armed with a knife, was going to flee.

31

*Cabaniss v. City of Riverside*, 231 F. App'x 407, 413 (6th Cir. 2007). Here, Boyer was cuffed and in the presence of at least two male officers. She was in the back of the squad car. However, and quite critically, Boyer then **assaulted** Shirley. This fact, established beyond a reasonable doubt, is not subject to debate—she pleaded guilty to a felony violation of assault against a peace officer. KRS 508.025(1)(a)(1). The crime includes recklessly or intentionally causing or attempting to cause physical injury. *See id.*

Thus, Shepherd applied the OC spray immediately in response to Boyer's felony assaultive conduct. This distinguishes the situation dispositively. *Champion* and *Cabaniss* demarcate limits on OC use, but each of those recognizes propriety of use (or, at least, does not proscribe use) for a defendant still "acting violently" and "posing a threat." With qualified immunity in play, and the burden thus on Boyer, she must point to a case that shows the impropriety of pepper-spray use against a cuffed arrestee that, despite the cuffs, assaults an arresting officer. She fails to do this. Shepherd witnessed a felony assault against Shirley. Even though the one kick may be of relative benignity, she committed the crime. The Court, accounting for all elements and considering the opinions of Harmening, does not see Shepherd's response as outside the boundaries of clearly established Fourth Amendment force law. He was an officer, on the scene reacting immediately to the commission of a felony against a co-officer in his presence. As such, the Court **GRANTS** the summary judgment motion (DE #84) as to Shepherd.

The Court already noted that it rejects any factual basis for the excessive force claim regarding the ankle injury. Boyer's sequencing and allegations simply do not, from any rational perspective, square with the video record. She did not have the ankle injury at jail arrival—Boyer (via multiple samples) does not limp or complain about any ankle problem until the second takedown, which happened in the jail. No reasonable jury could accept the claim that Shirley

slammed the car door on Boyer's ankle, fracturing it.[16] The Court **GRANTS** summary judgment on this unsustainable claim against Shirley.

### 3.   Municipal Liability[17]

Boyer's theory is that Speck's failure to train Shepherd and Shirley rose to the level of deliberate indifference to arrestees' constitutional rights, thus triggering policy / custom liability and implicating the County. There is inadequate support for this theory in the record. "[A] plaintiff may show municipal liability under 42 U.S.C. § 1983 under a 'failure to train' theory." *Rolen v. City of Cleveland*, No. 1:12 CV 1914, 2013 WL 12145960, at *3 (N.D. Ohio Aug. 7, 2013) (citing *City of Canton, Ohio v. Harris*, 109 S. Ct. 1197, 1200 (1989)). But, critically, "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton*, 109 S. Ct. at 1204. "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006). "[T]he risk of a constitutional violation arising as a result of the inadequacies in the municipal policy must be plainly obvious." *Id.*

---

[16] Her verified chronology directly conflicts with the clear video record. She claims in discovery that she kicked Shirley **after** he slammed the car door on and broke her ankle. DE #84-3 (Plaintiff's Discovery Responses), at 5 ("Request No. 6: Admit you kicked Allen Shirley on the night of your arrest on March 24, 2017. Response: Admit-AFTER he slammed the car door on ankle and broke it."). The video shows the kick occurring before the pepper spray and before Shirley ever closed the car door. Shirley BWC (Arrest Video), at 03:50–04:17.

[17] Plaintiff does not develop any individual-capacity supervisory claim against Speck. It is wholly unclear from the Amended Complaint whether Count VI names Speck in his official or individual capacity. The briefing offers some insight, though; while Defendants include a (brief) paragraph addressing a potential individual-capacity claim against Speck, Plaintiff, in response, pursues only a failure-to-train, policy / practice theory, discussing Speck solely in the official-capacity, *Monell* context. DE #110 at 4.

"There are at least four avenues a plaintiff may take to prove the existence of a municipality's illegal policy or custom." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). "The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Id.* Notably, *respondeat superior* is not a basis for county liability under § 1983; rather, counties may be liable only for policies or customs that actually cause federal rights violations. *Id.* at 432–33. "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 117 S. Ct. 1382, 1389 (1997); *id.* at 1391 ("[A] court must carefully test the link between the policymaker's inadequate decision and the particular injury alleged."). A failure-to-train theory fails unless a plaintiff shows "that a training program is inadequate to the tasks that the officers must perform; that the inadequacy is the result of the city's deliberate indifference; and that the inadequacy is 'closely related to' or 'actually caused' the plaintiff's injury." *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989).

In response to the PCSD Defendants' motion, Plaintiff points to several perceived issues with Shirley's training and understanding of law enforcement practices. DE #110 at 4–6. However, even under a Plaintiff-favorable reading of the facts, Boyer fails to show how any of these potential isolated training deficiencies, individual to Shirley, rise to the level of a County-backed policy or custom, or how such deficiencies causally connect Pulaski County with the injuries Boyer claims in this case. Broadly, Boyer simply notes PCSD training standards and policies and argues that Shirley and Shepherd failed to comply with them in this instance. But "[t]o infer the existence of

a city policy from the isolated misconduct of a single, low-level officer, and then to hold the city liable on the basis of that policy, would amount to permitting precisely the theory of strict *respondeat superior* liability rejected in *Monell*." *Harris*, 109 S. Ct. at 1210 (O'Connor, J., concurring in part).

More is required. Boyer must show either that the custom and practice of ignoring County arrest and force standards was so pervasive and widely tolerated that it rose to the level of an unofficial policy, or that the County was on notice of a repeated, persisting pattern of violations, reasonably indicating the existence of a *de facto* policy of violating individuals' constitutional rights. *See City of St. Louis v. Praprotnik*, 108 S. Ct. 915, 926 (1988) ("[T]he Court has long recognized that a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law.") (quotation marks omitted); *City of Oklahoma City v. Tuttle*, 105 S. Ct. 2427, 2436 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker.");[18] *Nelson v. Corr. Corp. of Am.*, No. 1:13 CV 2615, 2016 WL 1060308, at *9 (N.D. Ohio Mar. 14, 2016) (explaining that a plaintiff "must prove that there was an unofficial policy or custom rising to the level of a custom or usage with the force of law" and finding no municipal liability where there was "no evidence to establish a pattern of similar violations over time from which a jury might reasonably infer that the alleged

---

[18] Plaintiff has not alleged, must less demonstrated, that Shirley or Shepherd had a level of authority within the PCSD that would make either a municipal policymaker.

failures were more than isolated events or that they were so persistent and widespread so as to constitute official policies").

Boyer first takes issue with the PCSD arrest policy. The policy, though, permitting misdemeanor arrests only in certain specific circumstances, tracks Kentucky law. *See* Shirley Dep. at 44–45; KRS § 431.060. Boyer lodges no real challenge against the formal policy itself; rather, she seems to contend that Shirley's alleged violation of the policy somehow rises to the level of a municipal violation. Shirley acknowledged familiarity with the official policy, believing that his actions on the March 24 evening comported with it. *See* Shirley Dep. at 44–45 Perhaps he was wrong, and, as the record bears out that possibility, the individual capacity unlawful arrest claims against Shirley must proceed to a jury. But Plaintiff has not shown how even an individual violation of the policy, on a single night by a single officer (Shirley), is representative of a widespread, unofficial County custom of violations or of a broader training deficiency under the County umbrella. Second, Shirley's amorphous statements concerning his belief that probable cause should be gleaned from the totality of the circumstances, that he should maintain some level of "control" over officer-citizen encounters, and that he is not "trained" to allow people suspected of offenses to leave without identifying them do not, in context, demonstrating a pervasive training issue. Boyer does not explain how a single, non-policymaking-officer's policy interpretation of policing standards, even if incorrect, without more, leads to County liability.

The policy claims relative to force use fail; the Court rejected the predicate theories against the individuals, and this obviously forecloses the corresponding (and dependent) municipal claims as well.

Accordingly, the Court **GRANTS** DE #84 **in part** and awards summary judgment to the PCSD Defendants on the municipal liability claim.

36

### iii.   Claims Against PCDC Defendants (Counts 4 and 6)

As to the PCDC Defendants, Plaintiff asserts § 1983 excessive force claims against the jail officials, as well as a § 1983 claim against Moss in his official capacity, pursuing a failure-to-train municipal liability theory.[19]

### 1.   Excessive Force

The Fourth Amendment provides the proper analytical lens, where the events occurred during and after booking, but prior to any probable cause hearing. *See Hanson v. Madison Cty. Det. Ctr.*, 736 F. App'x 521, 528 (6th Cir. 2018) (citing *McDowell v. Rogers*, 863 F.2d 1302, 1306 (6th Cir. 1988)); *Aldini v. Johnson*, 609 F.3d 858, 865 (6th Cir. 2010)) ("The Sixth Circuit has long adhered to the view that the Fourth Amendment prohibits excessive force under certain pre-trial circumstances . . . Fourth Amendment protections, including those against excessive force, continue during booking and at all times prior to a probable-cause hearing.") (internal quotation marks and citations omitted). As noted, the Fourth Amendment inquiry evaluates the "objective reasonableness" of each use of force under the circumstances. *See Hanson*, 736 F. App'x at 528. The inquiry remains "an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 109 S. Ct. at 1872.

The Court recently charted again the force analysis with respect to pretrial detention:

> A pretrial detainee's excessive force claims trigger the objective reasonableness standard of the Fourteenth Amendment. *Id.* at 538 (citing *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015)). *Kingsley* blurred the lines between Fourth and Fourteenth Amendment analysis of pretrial detainees' excessive-force claims. *See Hanson*[, 736 F. App'x at 528 nn. 3-4]. Regardless, Sears's excessive force claims "are governed by an objective reasonableness standard." *Id.* at 528 (citing *Aldini*[,

---

[19] Plaintiff also briefly mentions a Kentucky failure to train claim against Moss. Per the record, Moss cannot be said to have deficiently trained any of his staff, for many of the same reasons discussed in relation to the municipal theory.

609 F.3d at 865]. *Kingsley* enumerates the considerations that bear on objective reasonableness:

> [1] the relationship between the need for the use of force and the amount of force used; [2] the extent of the plaintiff's injury; [3] any effort made by the officer to temper or to limit the amount of force; [4] the severity of the security problem at issue; [5] the threat reasonably perceived by the officer; and [6] whether the plaintiff was actively resisting.

135 S. Ct. at 2473.

> "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Graham*[, 109 S. Ct. at 1872]. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Smith v. Freland*, 954 F.2d 343, 346–47 (6th Cir. 1992) (quoting *Graham*, 109 S. Ct. at 1872). The Court must also "account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security." *Kingsley*, 135 S. Ct. at 2468 (quoting *Bell v. Wolfish*, 99 S. Ct. 1861 (1979)).

*Sears v. Bates*, 2020 WL 5996419, at *4–5 (E.D. Ky. Oct. 9, 2020) (footnote removed).[20]

Though the briefing examines several aspects of the confinement, the Court notes that, in her deposition, Boyer complained only about the physical takedowns she experienced at the PCDC. DE 92-6, Boyer Dep., at 11.

Here, Boyer's jail arrival included information from the charging officer to the jail to indicate that Boyer had been combative, been spitting, and had tried to assault him. At the jail, Boyer was upset during much of the early period. In the shower, she swiped or punched at the

---

[20] The Sixth Circuit treats as essentially consonant the Fourth and Fourteenth Amendment objective reasonableness force evaluations for a pre-trial detainee. *See Hanson*, 736 F. App'x at 528–29 (applying *Kingsley* and *Graham* factors together, under fact specific analysis of each case).

shower curtain twice, causing the officers in the room to terminate the shower and remove her. PCDC (Personal Property Bath), at 10:15:37–10:15:40. [Plaintiff claims and demonstrates no harm to this point.]

Plaintiff offers no law critical of the spit-hood or restraint chair use. Both were temporally limited and here based on the information received by the jail prior to booking and observed within the jail facility. Boyer does not endeavor to build her claim on these force uses, and the Court sees no claim premised on them.

The shower-room takedown was not, as a matter of qualified immunity, in violation of clearly established law. The officers report that Boyer was uncooperative and resisting commands. As the group moved from the shower room, all went to the ground. *Id.*, at 10:18:02. Boyer tried to kick Liner at this point, per Liner's report.   The takedown did not hurt Boyer and reflects a reasonable reaction by the women to assure their control over Boyer.

The fateful hallway takedown has even plainer justification. Boyer struck Coffman in the face. PCDC (Short Hall) at 10:18:25. She may claim not to have done this volitionally, but reasonable officers on the scene would (as the video plainly supports) deem the act one of violence by Boyer. This is the same person that had already kicked the deputy, punched the curtain, and kicked at Liner. The officers merely took Boyer down and then promptly moved her to the restraint chair. The unfortunate ankle injury resulted from awkward leg placement in the tangle of limbs. Jail staff may, through reasonable force application, maintain appropriate control of a violent or aggressive detainee. That is what occurred here.

The injury resulting to Boyer was significant. However, all other *Kingsley/Graham* factors (active resistance, force proportionality, tempered response, degree of threat) favor the officers. Importantly, at no point did the officers show a motivation toward anything other than institutional

control and maintenance of discipline. None acted toward Boyer in a way that was gratuitous or suggestive of a retaliatory or punitive motive. Boyer, facing the qualified immunity argument, must present a case delineating the line of clearly proscribed conduct. She offers only general Fourth and Fourteenth Amendment cases in the briefing. Nothing she cites shows that officers responding to a detainee who punched a jail officer clearly violate the constitution by placing the detainee on the ground to effectuate control. This resolves the federal claims against the jailers.[21]

This was Boyer's burden, to present the law with sufficient detail and clarity in this step of the qualified immunity analysis. The Court, on its own, notes cases recognizing that a tackle of or takedown against a subdued and non-resisting person would be excessive force. However, the cases to date do not condemn as unconstitutional, beyond debate, an officer tackling or taking to the ground a suspect or detainee that resists or threatens the use of force. *See, e.g., McCaig v. Raber*, 515 F. App'x 551, 555–56 (6th Cir. 2013) ("Because it was clearly established that the use of force on a non-resistant or passively-resistant individual may constitute excessive force, and because a reasonable jury could find that McCaig posed little or no threat based on the facts alleged, the district court did not err in denying Officer Raber's motion for summary judgment based on qualified immunity."); *Stanfield v. City of Lima*, 727 F. App'x 841, 850 (6th Cir. 2018) (extending qualified immunity to force use against person where person "reasonably [could] have been perceived to be resisting when he was tackled"); *Scott v. Kent Cty.*, 679 F. App'x 435, 441 (6th Cir. 2017) (extending qualified immunity: "While Scott was being removed from a cell for disruptive conduct, **he stepped towards Lyons in close quarters, unhandcuffed and with clenched fists**. We have not found other Supreme Court or Circuit precedent that would have put

---

[21] Given the discretionary use of force, a like analysis would resolve any state claims, as to the jailers, against Boyer. She cites to no Kentucky law that would define the jailers' conduct as clearly violative of Kentucky legal standards.

Lyons on notice that his takedown was an excessive use of force in this situation." (emphasis added)). Surely a detainee *throwing* a punch is in no better situation, relative to a law enforcement decision to tackle, than one simply posturing or threatening to do so.

The Court, finding no underlying federal or state individual violation, likewise finds no basis for municipal liability as to the jail. The Court **GRANTS** the summary judgment motion (DE #91) of the PCDC Defendants.

### iv.   Medical Care Claim (Count 7)

Plaintiff contends that Parsons, and by extension Corhealth, violated her rights by providing constitutionally inadequate medical care to her at the PCDC.[22] The parties disagree as to the applicable constitutional lens. Plaintiff claims that the Fourth Amendment "objective reasonableness" standard applies. Defendants disagree, arguing that the Eighth Amendment "deliberate indifference" standard, applied via the Fourteenth Amendment, governs here. The distinction typically matters because "[t]he Fourth Amendment objective reasonableness test is an 'easier standard for [a] plaintiff to meet' than the Fourteenth Amendment deliberate indifference test." *Esch v. Cty. of Kent*, 699 F. App'x 509, 514 (6th Cir. 2017) (quoting *Smith v. Erie Cty. Sheriff's Dep't*, 603 F. App'x 414, 419 (6th Cir. 2015)).

The Circuits have in the past disagreed on the proper analytical framework,[23] but the Sixth Circuit has since weighed in. "The Eighth Amendment's prohibition on cruel and unusual

---

[22] Though Plaintiff plainly pursues a medical care claim against Corhealth, as the company overseeing Parsons, she does not lodge a specific municipal liability claim in the medical context. [23] In 2017, the Sixth Circuit noted that it had "never squarely decided whether the Fourth Amendment's objective reasonableness standard can ever apply to a plaintiff's claims for inadequate medical treatment." *Esch*, 699 F. App'x at 514 (6th Cir. 2017) (citing *Boone v. Spurgess*, 385 F.3d 923, 934 (6th Cir. 2004)). It proceeded to discuss the varying Circuit approaches. The debate continues. *See Griffith v. Franklin Cty., Kentucky*, 975 F.3d 554, 570–71 (6th Cir. 2020).

punishment generally provides the basis to assert a § 1983 claim of deliberate indifference to serious medical needs, but where that claim is asserted on behalf of a pre-trial detainee, the Due Process Clause of the Fourteenth Amendment is the proper starting point." *Winkler v. Madison Cty.*, 893 F.3d 877, 890 (6th Cir. 2018). The *Winkler* Court proceeded to apply the deliberate indifference standard to the pretrial scenario. The framework encompasses both an objective and a subjective component. *Id.* (citing *Spears v. Ruth*, 589 F.3d 249, 254 (6th Cir. 2009)). "For the objective component, the detainee must demonstrate the existence of a sufficiently serious medical need." *Spears*, 589 F.3d at 254. "For the subjective component, the detainee must demonstrate that the defendant possessed a sufficiently culpable state of mind in denying medical care." *Id.*

The Sixth Circuit though, reflective of the ongoing debate and tension, confirmed recently that the deliberate indifference framework remains in place for analysis of medical-care, pretrial detention cases. *See Troutman v. Louisville Metro Dep't of Corr.*, 2020 WL 6336315, at *5–6 (6th Cir. Oct. 29, 2020) ("[F]or pretrial detainees like Charles, 'this right to adequate medical treatment attaches through the Due Process Clause of the Fourteenth Amendment, which affords pretrial detainees rights "analogous" to those of prisoners.' A prison official violates that right to adequate medical treatment when he or she acts with 'deliberate indifference' to a pretrial detainee's 'serious medical needs.'" (citations removed)).

Further, per *Troutman*:

Under our traditional analysis, the deliberate indifference standard at issue has both an objective and subjective component. *Downard for Est. of Downard v. Martin*, 968 F.3d 594, 600 (6th Cir. 2020). Under the objective standard, a pretrial detainee must show an objectively "sufficiently serious" medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To show that the medical need was sufficiently serious, the plaintiff must show that the conditions of incarceration imposed a "substantial risk of serious harm." *See Miller v. Calhoun County*, 408 F.3d 803, 812 (6th Cir. 2005) (internal citations omitted).

. . .

42

Under the subjective standard, "an inmate must show both that an official knew of her serious medical need and that, despite this knowledge, the official disregarded or responded unreasonably to that need." *Downard*, 968 F.3d at 600 (citing *Comstock*[ *v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)]. Under this standard, a plaintiff "must show both that a prison official 'subjectively perceived facts from which to infer substantial risk to the prisoner' and that he 'did in fact draw the inference'" but disregarded that risk. *Id.* (citing *Comstock*, 273 F.3d at 703); *see also Farmer*, 511 U.S. at 834.

. . .

This distinction is critical "because a finding of deliberate indifference requires a sufficiently culpable state of mind, which the Supreme Court has equated with criminal recklessness." [*Galloway v. Anuszkiewicz*, 518 F. App'x 330, 336 (6th Cir. 2013)] (citing *Weaver v. Shadoan*, 340 F.3d 398, 410 (6th Cir. 2003)). The official's "state of mind must evince 'deliberateness tantamount to intent to punish.'" *Miller*, 408 F.3d at 813 (quoting *Horn*[ *v. Madison Cty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994)].

*Troutman*, 2020 WL 6336315, at *5-6.

Noting the differences between the parties' standards, the Court finds a triable issue in the triaging and treatment Nurse Parsons gave Boyer on the night in question. Parsons was on the scene and observed Boyer immediately after the broken ankle occurred. Boyer was in undeniable distress, repeatedly screaming that the tackle had broken her ankle. She could put utterly no weight on the ankle—Parsons saw all of this firsthand. A broken bone—here the displaced ankle fracture—surely qualifies as serious. *See Taylor v. Franklin County*, 104 F. App'x 531, 538 (6th Cir. 2004) (a plaintiff's "debilitating immobility" indicated a serious medical need, even if defendants did not believe him); *Gray v. Dorning*, 202 F.3d 268 (Table) (6th Cir. 1999) (unpublished table decision) ("We find that Gray's broken wrist constituted a serious medical need."). Nurse Felts's opinions buttress this.

The Court also finds an issue for trial on Parsons's subjective interpretation. She confirmed a likely fracture. PCDC (Desk Entry), at 11:36:30. She confirmed the gravity of a dislocation. *See*

*id.* She knew the distress and pain Boyer endured. Plaintiff specifically requested to go to the hospital *and* expressed the significance of her pain at many points.

The troubling aspects, to the Court, appear in the interaction between Parsons and Boyer. Upon first approaching Boyer post-fracture, Parsons warned her to keep her foot down or she would "step on it." *Id.*, at 10:19:52. She chided Boyer over the injury, asking if she had "kicked somebody?" *Id.*, at 10:21:10. Despite Boyer screaming in pain, *id.*, at 10:22:08, Parsons almost immediately declared that Boyer would not go to the hospital. *Id.*, at 10:23:50 Parsons claimed this as her "call" and said Boyer could go when she could get up and "walk" to the hospital. *Id.*, at 10:24:27. Later, Parsons said "too bad" in response to Boyer's lamentations—she also sharply rebuked Boyer for hurting "one of my officers." *Id.*, at 10:29:34. Parsons was angry toward Boyer, and acted in a proprietary way toward jail employees even though Parsons worked for a contractor, not for the jail.

Later, Parsons overheard Boyer answer the intake question suggesting she was suicidal. *Id.*, at 11:04:12. Parsons pounced on this, declaring she could not leave the facility and had to be smocked overnight. *Id.*, at 11:04:36. This despite Boyer immediately saying she was not suicidal and had not made any suicide attempts within two years. *Id.* Parsons clung to the suicide reference later when she flatly characterized Boyer as unsuitable for transfer. *Id.*, at 11:36:35. She promised an x-ray in the morning (the x-ray did not occur for close to 48 hours). *Id.*

Critically, when finally denying hospitalization, Parsons recognized the gravity of a dislocation, commenting that a fracture *without* dislocation could wait a lengthy period for casting. *Id.*, at 11:36:45. She also knew she had not x-rayed the joint. Presumably, then, she knew that only an x-ray could answer the question. Here, of course, the ultimate x-ray showed dislocation, creating the emergency Parsons otherwise denied in her remarks.

44

Nurse Felts lodges multiple criticisms against Parsons regarding her approach and treatment. Interestingly, Felts and Boyer do not directly criticize the rest of the care team. Thus, the PA who delayed the x-ray and the doctor that gave later orders are spared and not parties. Felts criticizes the delay and effect of delay. It remains to be seen whether Boyer can pursue all delay-based damages at trial. Without a doubt, though, Parsons at most promised Boyer ice and ibuprofen, and it is unclear when Parsons first received any pain alleviation.

For purposes of this motion, the Court finds that a jury should assess Parsons's initial delay. Felts supports that delay exposed Boyer to extreme pain, and potentially serious complication risks, over the initial period. Parsons's attitude arguably was punitive toward Boyer and this, after all, is the core of what deliberate indifference as a standard springs from. If Parsons withheld treatment to punish Boyer or teach her a lesson for hurting a PCDC jailer, a jury could find the conduct to have violated Boyer's constitutional rights. Parsons knew of the likely fracture and could see the resulting pain to Boyer. She refused from the first moment to initiate a hospital transfer, and the jury must evaluate the probity of Parsons's mindset under the relevant standards. A jury could find that she "responded unreasonably," in *Troutman*'s words, to the demonstrable need presented by the fracture.

Because Boyer does not muster any facts or argument related to Corhealth itself, the principles of municipal liability, or the acts of other Corhealth agents, the Court **GRANTS** summary judgment to the entity. Only the claim against Parsons, that, per the Amended Complaint ¶¶ 37-38, she "failed and refused to render critical, immediate healthcare" causing "grievous pain and suffering" remains.

### D. CONCLUSION

For all of the reasons discussed, and on the terms specifically outlined in this opinion, the Court **ORDERS** as follows:[24]

1. The Court **GRANTS** unopposed DE #94;

2. The Court **GRANTS in part** and **DENIES in part** DE #86, as to Felts, and the Court **GRANTS** DE #86, as to Harmening;

3. The Court **DENIES** DE #88;

4. The Court **GRANTS** DE #89;

5. The Court **GRANTS in part** DE #84 (PCSD Defendants' summary judgment motion), as to the state law malicious prosecution claim, the § 1983 municipal liability claim, and as to the § 1983 excessive force claims. The Court **DENIES** DE #84 as to the state law and § 1983 false arrest / imprisonment claims;

6. The Court **GRANTS** the PCDC Defendants' motion, DE #91 (and, simultaneously, DE #92); and

7. The Court **GRANTS** DE #87 (Corhealth Defendants' motion) in part and **DISMISSES** Corhealth. Parsons remains a defendant on the § 1983 medical care claim.

This the 18th day of November, 2020.



Signed By:

_Robert E. Wier_

**United States District Judge**

---

[24] The Court sees no need to address punitive damages. The Amended Complaint does not request them, and Plaintiff notably declines to respond on the topic after Defendants briefly mention it in seeking summary judgment. Punitive damages are not before the Court.